Chater v. San Francisco Sugar Refining Company.

N. CHATER v. THE SAN FRANCISCO SUGAR REFINING COMPANY, GEORGE GORDON AND JAMES B. BOND.

C., G. & B. enter into an agreement to form a corporation for commercial purposes. By this agreement and the corporate act subsequently filed, each corporator is entitled to an equal proportion of the stock; G. and B. contribute to the capital in money, and C., having no money, proposes and is allowed to give his note in lieu of money, pledging his stock to G. and B. as security, they agreeing to raise him the money on the stock. It is agreed that the stock due him shall be issued on a given event; the event happens. The note is not made nor the stock issued to him, but the company, controlled by the other two corporators, go on with their business, recognizing C. as a corporator. No demand is made for his note or the stock. The corporation makes profit enough to pay the debts, and the share coming to C. pays his contribution to the capital. No stock having been issued to C., he now claims and sues to enforce the specific performance of the agreement: *Held*, that if G. and B., who were to raise the amount to be contributed by C., having by the agreement the right to demand his note and stock, do not demand them, or issue the stock to him, and without *this form* of security advance the money which was to be raised, they are to be considered as waiving this formal right, and cannot plead the want of a mere literal compliance as a forfeiture of the interest of C. in the common enterprise; that in equity, the substance of the whole transaction was fulfilled; the object of the security answered; and the original right of C. to his stock was not lost by mere failure on his part to give a particular form of security, upon which G. and B., who were beneficially interested in demanding it, did not insist; and that C.'s stock, whether actually issued in the form of a certificate or not, is bound by the agreement, and he is entitled to it.

This case is distinguished from mere executory agreements, through a performance of the terms of which a party becomes entitled to property, because here C. was entitled, as of original right, to his stock, and the conditions annexed to the issuance of the certificates to him, even if not waived, were mere qualifications in favor of G. and B. in the nature of security to them, the substance of which security they enjoyed, though not in the precise way described.

Chater *v.* San. Francisco Sugar Refining Company.

*Green* v. *Covillaud*, (10 Cal. 317) and other cases cited by appellants here, are examples of mere executory agreements.

In this case, after the execution of the agreement, the corporation was formed under the laws of this State, C. G. & Chas. W. B. being the trustees—the agreement stipulating that they should be the first trustees, and the latter probably being assignee of B., the party to the agreement—and they were also the sole corporators, and organized with full knowledge of the agreement, which not only contemplated the formation of the corporation, but prescribed the terms and rights of the members in the corporation and corporate business. Under the agreement, C. was to be superintendent of the business as well as trustee. The corporate business was commenced, and for a long time prosecuted with reference to this agreement reciting these terms and affirming these rights : *Held,* that under these circumstances the *corporation* adopted and is bound by the agreement.

Whether an innocent purchaser of stock, buying subsequently without notice, would be affected by such acts of the corporators adopting the terms of the agreement, not involved and not decided.

A corporation for commercial purposes, formed under our statute, is little more than a joint stock company under the English laws, more nearly resembling a limited partnership under special articles than a corporation at common law.

The rights in a corporation under our laws can be fixed by contract. A man can as well make an agreement with another for certain stock in a corporation to be organized hereafter, as an agreement for stock in a corporation already existing ; and may contract that each shall have so many shares of stock on such and such terms.

Where a corporation is formed, under our system, between certain parties for commercial purposes, in pursuance of a previous agreement fixing the terms of the corporation and the rights of the members therein, the corporation, when formed, is the mere agency of the associates created for the sake of convenience in carrying out the agreement, *as between those who made the bargain*— the different characters and forms in which or by which the bargain was made, and the order in which the several parts of it were executed, making no substantial difference in the obligation.

But even conceding that the corporation, formed in execution of such preceding agreement, is a thing essentially distinct and exclusive, making the men inside of it and controlling it wholly different from the same men just before they went into it, still their respective shares of stock are interests and property in *esse* or *posse,* which entitle the holder to certain privileges of value, and may entitle him to profits ; and whether the corporation is bound of itself, and as a separate entity, to recognize a right in a claimant to this interest, a private person holding these shares or interests would be bound to such claimant for them.

A stipulation in the agreement in this case, that C., who was to superintend the erection of a sugar refinery for the contemplated business of the corporation, should continue his services for five years at a certain annual salary, was held not to be a condition precedent to the vesting of his title to his shares of stock ; and the fact that, from paralysis, he was rendered unable to discharge his duties as superintendent, except for a limited period, was held not to forfeit his stock. See facts.

If, on settlement of the account in this case, it is found that C. owed on account of his stock, or the corporation owed money for which the stock should have been sold, then the question, whether the stock which was designed to be a security for the debts would be, in equity, charged and ordered to be so applied, is reserved, and the decree affirming C.'s title to the stock so modified.

APPEAL from the Twelfth District.

The material facts are stated in the opinion of the Court. A few are added as throwing some additional light upon the case.

Chater arrived in San Francisco, May, 1856; commenced erecting the sugar refinery in July following; and commenced putting in the machinery about August or September, 1856. The machinery was not all in, the roof of the building was not on, and the refinery was not in working order on the seventeenth day of October, 1856, when Chater was seized with paralysis, never left his house thereafter, and died in the summer or fall of 1860. It was in proof that Chater's son, who had been assisting in the erection of the refinery under the directions of his father, continued to give directions after his father's confinement to the house; that the son and defendant, Gordon, frequently consulted with Chater at his house, etc.; and after the first boiling of sugar, which was January 10th, 1857, it was shown him, and he gave directions how to improve it, etc. The son was employed in the refinery until the spring of 1858, when this suit was commenced. There was some conflict of testimony as to the capacity in which he acted: whether as superintendent, as a substitute provided by the father as the complaint avers, or as *boiler*, as defendants claimed, at five dollars per day.

The Court below decreed that Chater " owns and is entitled to one-third, or three hundred and thirty-three and one-third of the original shares of the capital stock" of the sugar refinery, and all " duplications, increase, profits and dividends made or accrued upon said one-third since the organization of said company;" and the company was directed to issue said stock to plaintiff, " subject to the restriction that he is not allowed to sell the said stock prior to the fourth day of April, 1861;" that the company have and receive from plaintiff for his said one-third the sum of $12,500, with interest from September 1st, 1856, at two per cent. per month, subject to an accounting between plaintiff and the company; that plaintiff

reassign to said company so much of his stock as represents two hundred and fifty original shares, to secure the payment of said $12,500 and interest, to be held by the company until an account of the profits, increase and dividends upon said one-third can be stated between plaintiff and the company; and if it shall appear upon such accounting that the amount due plaintiff for the profits, increase and dividends of his one-third does not amount to said $12,500 and interest, it was decreed that, after applying the same to discharge: 1st, the interest as it accrued on said $12,500; and 2d, upon said $12,500, plaintiff pay the deficiency to the company; and upon such payment, the company to reassign and deliver said stock held by them as security to plaintiff; and in case the amount due plaintiff for profits, increase and dividends exceed said $12,500 and interest, the company to pay such excess to plaintiff. The decree closes by sending the case to a referee to take the account. Defendants appeal.

*Hepburn & Dwinelle*, for Appellants.

I.   The company is not bound.

The second agreement of Gordon and Bond with Chater was a mere covenant on their part that the company would issue the stock on the terms agreed. The company made no agreement whetever with Chater. This could have been done in two ways: first, by a direct contract with Chater according to the tenor of his agreement with Gordon and Bond; and second, if Chater refused to do this, by accepting an assignment of the second agreement from Gordon and Bond, as provided for in that agreement.

Neither of these things was done; and it is therefore evident that there was no privity between Chater and the company. As the company was formed, and the work of putting up the refinery actually begun, it was no doubt the *intention* of Chater to execute, and the company to accept the agreement as called for in the memorandum guaranteed by Gordon and Bond. The fact, however, is that nothing of the sort was done; and the company being no party to either of these agreements, is therefore discharged.

It may be objected to this, that the company was merely Gordon, Bond & Chater, and that the acts of the company in employing

Chater in the construction of the building and the putting up of the machinery is a virtual acceptance and ratification of the agreement made with him by Gordon and Bond. The answer to this is, that the company represented not Gordon, Bond & Chater, but the stockholders; Gordon, Bond & Charter were to be large but not exclusive stockholders. Two hundred and fifty shares were to be retained by the company, to be sold to all buyers, and Gordon and Bond had no restriction on their power to sell out when they liked—a privilege which Bond actually exercised, for at the date of his answer he was not a stockholder. As against the stockholders, there is nothing to fix the corporation with knowledge of this agreement. The constitution is entirely silent in regard to it. For aught that appears, a majority of the stock may be held by stockholders in total ignorance of this agreement; or Chater may have offered to execute the agreement, and the company have declined to accept it. In issuing stock to Gordon and Bond, what would be the voucher of the trustees to the company? The money. In issuing stock to Chater, what would be the voucher? The agreement.

II. Chater could not demand or sue for the stock till he had first given or tendered the notes.

Gordon was to pay $12,500 in money for his stock, and Bond was to pay a like sum in money for his. Chater had no money, and he was to pay for his in notes; and he can therefore no more sue for the stock, without giving the notes, than Gordon and Bond could sue for theirs without paying the money. But it may be argued that this is an equity case; that a Court of Equity considers that to be done which equity would decree to be done; and that as the agreement calls for the giving of the notes, the Court has the power to treat them as given, and decree accordingly.

The answer is, that this principle is never invoked except against a delinquent, and in favor of the justice which the delinquent withholds, and that here it would be in favor of a delinquent and against justice.

III. The rendition by Chater of his personal services to the company for five years, was the chief inducement to cede the stock, and a condition precedent to his right to it.

1. By looking at the terms of Chater's contract, it will be seen

that he binds himself unconditionally to give his services to the company for five years; and if the Court shall be of opinion that the performance of this contract was part of the consideration which Chater was to pay for the stock, then the paralysis of Chater is no excuse for the nonperformance of his contract: first, because he is asking for the thing without paying the price of it; and second, because if he wished to be let off for this or any other reason, he should have put it into his contract, and thereby given to the other side a chance to accept or refuse. (See Chitty on Cont. 630; 8 Term R. 267, and cases there cited.)

2. Then, was the five years' personal service a part of the consideration for the stock? This question can be resolved only by an appeal to the contract itself. This is a commercial, and not a common law instrument, and drawn by the parties themselves, and is therefore to be considered not in a literal and technical, but in a liberal and common sense spirit. (Story on Con. 673.) It recites, that " N. Chater has induced the said Bond and Gordon to enter into the organization of a company in San Francisco, for the purpose of sugar refining and its collateral branches, and the said Bond and Gordon do so on the representation of said Chater and on his promise to manage the same for five years." Here is a direct acknowledgment that Bond and Gordon agreed to organize the company on the faith of Chater's promise of service. What were the details of the organization? Each of the three were to have an equal interest. Bond and Gordon were to pay for theirs in money, and if Chater was not to pay for his by his services, then his third would be a donation, for he had nothing else to pay with. The agreement says, the stock was to be issued to Chater on the execution of " an agreement to manage the works;" but that he was not to be considered the owner of the stock until after the full performance of their agreement, is proved by the further clause, that the stock was to be issued to him with such restrictions as should prevent him from selling it during the five years that he owed his personal services to the company, showing that his title was merely nominal, and to be controlled by the company till he had worked it out.

It is objected to this, that the agreement for the personal services

is independent of the agreement for the stock, because the former were to be paid for by the company at the rate of $3,000 a year. The answer is, that the $3,000 was an additional consideration besides the stock to be given by the company for Chater's services, and prove not how little, but how much the company were willing to pay for them. If the position be true, that there is no connection between the services and the stock, and that the former were to be fully and solely paid for by the $3,000 a year, then the stock was not only due the day the company was organized, but Chater was to have for nothing what Bond and Gordon were to pay $25,000 for.

3. Even if the Court should be of opinion that Chater has a right to the stock, it should be liable to the setoff of all damages which the company have sustained by reason of Chater's violation of his contract. The decree is absolute for the stock, takes no notice whatever of the damages sustained by the company, and treats Chater in all respects as if he were nowise in default.

IV.  It is argued that the right to the stock is independent of the personal service, because it is stipulated that if Chater was discharged by the company, it was to be " without prejudice to this agreement."

This clause in the contract was intended to protect the company against an eventuality which never happened, to wit : the inefficiency or misconduct of Chater.  Five years was a long time to be bound to accept the service of a man who had never been on trial for a day.  The company, therefore, reserved the right, on given conditions, to discharge Chater ; but the case here is, that Chater discharges himself.  Having abandoned the enterprise in the beginning, and contributed to its success neither time, labor nor money, he is a stranger to its results, whether profitable or unprofitable.  This reservation "without prejudice to this agreement," indicates that Chater knew the law to be as it is, namely : that if he had been discharged for incompetency, his rights would have been extinguished.  It indicates also the converse rule, that if Chater discharged himself, his inchoate rights were also extinguished, and there is no reservation that his discharging himself should be "without prejudice to this agreement."  Now Chater's nonperformance,

although occasioned by accident, or by an act of God, over which he had no control, has the same effect as if it were willful. It is simply "nonperformance," which precludes all compensation. (Chitty on Cont. 735–736.) The act of God will sometimes shield a party from the penalty of nonperformance, where performance has become impossible by the destruction of the subject matter, or by an equivalent casualty; but never has it been held that it entitled a party to compensation in a case where performance was a condition precedent. (Chitty on Cont., ut supra, 735–736, and cases cited.)

The plaintiff's counsel have acknowledged the soundness of this position by their absurd averment that Alfred Chater was to be a substitute, in case of sickness, for N. Chater, the plaintiff; an averment false, disproved by Alfred Chater himself, and which, even if it had been true, they had no right to show; for the condition not being in the agreement, to establish it by parol proof would be, in effect, to make a new agreement.

For the other points of this case we refer to the brief of Mr. Patterson.

*Wm. H. Patterson,* also for Appellants.

Plaintiff is not entitled to a decree for specific performance and delivery of the stock.

I. It was a condition precedent to the issuance of stock to plaintiff, that he should execute and deliver notes of $12,500; that he should have paid the notes May 1st, 1858, before the suit was brought. (*Beem* v. *McKusick,* 10 Cal. 540; 21 Pick. 439; Parsons on Contracts, 42, 45, and cases cited in notes; *Grant* v. *Johnson,* 1 Seld. 247; *Bean* v. *Atwater,* 4 Conn. 3; Chitty on Cont. 807, 10th Amer. Ed. by Perkins, note O.)

II. It was a condition precedent to the issuance of stock that plaintiff should render five years' services for the corporation, or should have executed a contract to do so. (*McClure* v. *Pierce,* A. K. M. 64; 10 Cal. 573; *Walker* v. *Jeffreys,* 23 Eng. Chan. R. 348; *Wright* v. *Howard,* 1 Id. 191; Sim. & Stu. 190; *Cosilake* v. *Still,* 1 Russell, 376; 1 Ohio, 7; *Colson* v. *Thompson,* 2 Wheat. 336; *Benedict* v. *Lynch,* 1 Johns. Ch. 378; *Scott* v. *Field,* 7

Ohio; 10 Cal. 325; *Brown* v. *Harris*, 12 Ohio, 10; *Milward* v. *Earl Thanet*, cited in note 2, 5 Ves. 720; *Rogers* v. *Saunders*, 16 Me. 97; Willard's Eq. Jur. 295; Id. chap. IV, 262, 292, citing *Dohret* v. *Rothschild*, 1 Sim. & Stu. 590; 1 Eng. Ch. R. 590, argument of Pemberton, 596.)

Plaintiff's skill and knowledge of the business, his capacity (as represented by himself) to skillfully conduct sugar refining, and his agreement to do so for five years, was, (in addition to the giving of the notes) the great inducement to the formation of the joint stock company and the creation of any stock to be issued.

The failure to perform which, was a failure of the beneficial consideration upon which he was to have an interest of one-third in the corporation. His services have not been rendered, and he has in no substantial manner contributed to building up, establishing or sustaining the sugar refinery.

III. The circumstances of the case show an abandonment by the plaintiff, and the other parties, of the contracts. Plaintiff never gave his notes, has not paid the principal nor interest, and has rendered no services since the refinery went into operation. (*Green* v. *Covillaud*, 10 Cal. 317; 6 Id. 571; *Pigg* v. *Cordier*, 12 Leigh. 69; *Henderson* v. *Hays*, 2 Watts, 153; *Mason* v. *Armitage*, 13 Ves. 25; *Mortlock* v. *Butler*, 10 Id. 305; *Longworth* v. *Taylor*, 1 McLean, 394.)

IV. Plaintiff's remedy, if any, is at law and not in equity. (Cases *supra.*)

*O. L. Shafter*, for Respondent.

Bill for specific performance of a contract: 1st, to issue stock; 2d, for an account.

The main question is on the plaintiff's right to the stock. It is objected: 1st, that the giving of two notes for $6,250 each was a condition precedent, and that the notes have not been given.

Answer: 1st, that the notes have been given is in effect admitted in the contract; 2d, the giving of the notes by plaintiff is not a condition precedent to his right to claim the stock. True, one part of the agreement purports that the notes are to be given, and that the stock is to be issued at the same time; but in another part, the

stock is to be issued to the plaintiff on the happening of a particular event, to wit: on the execution by him of the agreement to manage the works, and that event happened on the fourth of April, 1856. 3d. It is apparent that the intention was that the issuing of the stock was to precede the giving of the notes, for how could Chater secure the notes as required unless the stock had been issued to him to begin with. 4th. The giving of the notes was matter of mere form, and did not go to the substance of the contract. a. The contract created the money liability, and if the notes had been given no new or additional money burden would have been imposed by Chater. b. The written contract creating the cash liability, and fixing the rate of interest and the time from which it was computed, and the time when the principal sums and the interest thereon were to be paid, would be as available for all the purposes of pleading and evidence as the notes. c. It was not contemplated that the principal sums should be paid except by way of dividends; and as to interest, it was expressly arranged that Bond and Gordon were to advance it to the company.

Result. The failure to give the notes when the defendants had another written security just as available; the nonpayment of the $12,500 when no advance of money by plaintiff was even contemplated; the nonpayment of interest when it was expressly stipulated that it was to be advanced by Bond and Gordon in the event of nonpayment by Chater; all justify the conclusion that the alleged failure to give the notes did not go essentially to the consideration of the contract. 5th. A waiver of the notes is shown by the general current of the transactions between the parties. Appellants argue that the notes should have been given at farthest by September 1st, 1856. But they kept him at work thereafter, and until he was struck with paralysis in November, and advised with him and acted under his instructions during his illness, and accepted plaintiff's son as a substitute.

Second objection. Plaintiff has forfeited all claim to stock, for the reason that he did not continue to manage for the stipulated term of five years.

Answer: 1st, he was prevented by the act of God; 2d, it is expressly stipulated that if plaintiff should be removed by the com-

pany, his removal is " to be without prejudice to this agreement," but that " his yearly salary of $3,000 shall cease and determine."

Chater agreed to work for five years, and to engage in no other business. He gave the company the right to discharge him at any moment when they should choose to become " dissatisfied," and bound himself furthermore not to engage in sugar refining, either for himself or for others, when discharged. After having put himself into their power to this extent, it can hardly be supposed that he would have engaged to submit to a forfeiture of his stock as consequent upon what might be a capricious dismissal, made perhaps as the five years were about to expire. He was one of the original adventurers. The suggestion came from him. He was the only one of the three familiar with the business, and he was an expert as shown by all the proof. He was also a member of the corporation and entitled to the position of trustee. Here are of themselves grounds of title to a one-third share of the stock. The defendants' argument goes much too largely upon the assumption that Bond and Gordon were the only principals in the undertaking, and that Chater was a mere hireling working for wages. Chater was a joint principal with them, and if he was paid a salary in addition to his share in the general venture, it was but a just acknowledgment that his brains and hands were of more value to the company than those of either or both of his associates.

*Heydenfeldt*, also for Respondent, argued the case orally.

BALDWIN, J. delivered the opinion of the Court—FIELD, C. J. and COPE, J. concurring.

This was a bill filed by the plaintiff for the specific performance of a certain agreement made in New York between the plaintiff and the defendants, Gordon and Bond, on the fourth of April, 1856. The agreement provided for the formation of a company, to be called the " San Francisco Sugar Refining Company," to consist of 1,000 shares of stock, of the nominal value of one hundred dollars per share. This agreement provides that one-third of the stock, or three hundred and thirty-three and one-third shares, were to be issued to J. B. Bond or his assigns, upon him or them paying

$12,500, and Bond to convey back to the company eighty-three and one-third shares of the stock into the common stock of the company. A like provision is made in reference to Gordon. The third clause in the agreement is in these words: " one-third, or three hundred and thirty-three and one-third shares of said stock, are to be issued to George Gordon or to his assigns, upon him or them paying $12,500, and the said George Gordon is to transfer back to the company eighty-three and one-third shares of the said stock into the common stock of the company."

The agreement proceeds: " one-third, or three hundred and thirty-three and one-third shares of said stock, are to be issued to Nathaniel Chater or his assigns, upon him or their executing two notes—one of $6,250 to J. B. Bond, collaterally secured by one hundred and twenty-five shares of stock, having two years to run, bearing two per cent. per month interest; and another of $6,250 to George Gordon, collaterally secured by one hundred and twenty-five shares of stock, having the same time to run, and bearing the same interest—and the said Chater is also to transfer back to the company eighty-three and one-third shares of stock into the common stock of the company.

" It is agreed that the two hundred and fifty shares of stock thus given back to the company shall be sold only by a majority vote of the company, and J. B. Bond guarantees to the extent of the note of said Chater held by him, ($6,250) that from one hundred and twenty-five of the shares he will raise the sum of $12,500, as needed, and George Gordon guarantees to the extent of the note of said Chater held by him, that he will, on one hundred and twenty-five shares, also raise the sum of $12,500.

"And it is further agreed, that the shares not sold belonging to the common stock of the company, as above recited, shall, if it be not found necessary to sell them, be divided equally among the three parties hereto, but not until the company's works have been in operation for at least twelve months.

" It is agreed that George Gordon shall organize the company in San Francisco by taking out articles of incorporation according to law, and that the first Trustees shall be Charles W. Bond, Nathaniel Chater and George Gordon.

Chater v. San Francisco Sugar Refining Company.

" That upon the organization of the company and on the enactment of its by-laws, the Trustees shall issue stock as herein set forth, to the parties, upon their furnishing the respective amounts they herein agree to furnish, or in proportion as they furnish said amount.

" Each certificate of stock to be signed by two Trustees and countersigned by the Secretary.

" The stock of N. Chater to be issued to him as herein provided on the execution of the agreement to manage the works, a memorandum of which agreement is made simultaneous with this.

" The said Gordon and Chater agree that, to the extent of the interest which they may control, they will vote for the said Bond to act as agent of the company in San Francisco, attending to the commercial affairs of said company there, for which service he shall receive a salary of $1,800 per annum."

Afterwards, another agreement was made, of the same date, as follows :

" Whereas, N. Chater has induced the said Bond and Gordon to enter into the organization of a company in San Francisco for the purpose of sugar refining and its collateral branches ; and the said Bond and Gordon do so on the representation of said Chater and on his promise to manage the same for five years, and to retain his interest therein during that time, and upon his further representation that he can skillfully manage a sugar refinery ; with a view of engaging the services of said Chater, the said Bond and Gordon, by an agreement of even date herewith, have agreed to set apart to said Chater two hundred and fifty shares of the capital stock of the company, at the rate of fifty cents on the dollar of the par value of the shares, and to take therefor the notes of said Chater, (two, and $6,250 each) having two years to run, collaterally secured by the two hundred and fifty shares, and also to give the said Chater one-third of the reserved or paid back shares which may not be sold, as provided for in agreement of this date made between the present contracting parties.

" Now the said Chater agrees with and to the said Gordon and Bond, (which agreement they make for the company they propose to form, and with the understanding that they shall be at liberty to transfer the said agreement to the company when it shall be formed)

that he, the said Chater, will proceed to San Francisco and there superintend the erection of the sugar refinery and construct the same as he may be directed by the company, with regard to location, cost and extent, and get the same into working order; and that after the same is in order he shall superintend the business of sugar refining for the said company for the period of five years from the date of first of May, 1856 (eighteen hundred and fifty-six).

" That he shall engage in no other business during the period of his engagement with this company, but devote his entire time to the business of the company during the time he is manager.

"And the more effectually to secure the performance by him, the said Chater, of this agreement, he hereby agrees that during the period of his engagement above named of five years, he will not dispose of such of his shares of stock in the company (or sell or transfer them) as he may have been enabled to pay for out of the dividends made upon the stock issued to him, and the said Chater agrees that the stock shall be issued to him with such restrictions as shall prevent him selling it during the above named period.

" He, the said Chater, also agrees with the said Bond and Gordon that the dividends declared from time to time upon the stock issued to him shall go to the payment of the notes hereinbefore referred to.

" The said Bond and Gordon undertake that the proposed company shall, in consideration of the premises, agree to pay the said Chater the yearly salary of $3,000, in monthly sums of two hundred and fifty dollars per month, to commence at the time the works go into operation, and shall also pay him the monthly sum of one hundred and fifty dollars, during the time his services may be required in erecting the works prior to commencing operations, and up to the time of commencing operations.

" That said Chater also agrees, that if at any time the company become dissatisfied with his management, they may remove him without prejudice to this agreement, in which event his yearly salary of $3,000 shall cease and determine, but he, the said Chater, shall not be at liberty to engage in California in the business of sugar refining, either for himself or for others.

" Interest on the notes given by said Chater to commence on the first day of September of this present year.

" It is agreed that said Bond, and the said George Gordon, shall procure for the said Chater, within sixty days of being notified by him of his readiness to pay the notes herein specified, the said notes and collaterals, though the notes shall not have matured, and that in the event of the said Gordon and Bond respectively failing to procure the said notes, the interest upon same shall from such date be reduced to one per cent. per month.

" It is further agreed, until dividends shall have been declared by the company of sufficient amount so that those due on the stock of said Chater, hypothecated to secure said notes, shall be sufficient to pay the interest due and accruing monthly on those notes, that the company shall advance to said Chater the interest so upon due until the maturity of the notes as a loan to him.

" The said Gordon and Chater agree, that to the extent of the interest which they may control, they will vote for the said Bond to act as agent of the company in San Francisco, attending to the commercial affairs of said company there, for which service he shall receive a salary of $1,800 per annum."

We have given the agreement at length, as it would require as much space to give its substance as that occupied by the copy.

Chater, afterwards, on the seventeenth of October, 1856, was seized with paralysis, and was rendered incapable of attending to the business.

The notes mentioned in the agreement as those to be made by the plaintiff were never given, nor, so far as appears, demanded.

The defense seems to rest principally upon the point that these notes were not made as contemplated by the agreement; that the plaintiff, therefore, did not comply with the contract on his part, and consequently has no right to insist on performance by defendants; that one of the principal, if not the leading, inducements to the contract was the rendition of the services of the plaintiff, and that the failure to render these, though caused by his sickness, was a failure of the consideration of the agreement; and that the agreement was that of the individual members or stockholders, Gordon and Bond, and not of the corporation.

The appellants' argument seems to proceed upon the idea that Gordon and Bond were the principal parties in this company and to

16

this agreement, and that Chater was to come in secondarily and derivatively, and to acquire the interest which he claims by concession from them, or through or by virtue of certain conditions to be performed by contract with them.    This, however, does not appear to be the true relation of these parties.    The plaintiff and defendants were the original projectors of the enterprise, and equally interested and influential in respect to matters involved.    Chater's rights and obligations stand substantially on the same footing as those of Bond and Gordon.    He was, in other words, an equal partner, with the same original rights, and the benefits of the agreement accrued to him in like manner and to the same extent as to them. Upon the organization of the corporation, the stock and the right to control the affairs of the company as stockholder would enure to him as well as to them.    It is true, some conditions and restrictions qualifying his right to receive the stock appear in the agreement; but the same observation applies to them.    His title to the stock and to the interests in the business come from his character as stockholder, and from the original articles of association.    It is true, that in order to entitle him to receive the certificates of stock which he claims, as against Bond and Gordon, he must comply with the conditions, which, by the contract, he bound himself to perform. These conditions, as we have seen, are, as in one part of the agreement set out, the execution of two notes—one to Gordon and the other to Bond.    It is provided, that, for the payment of these notes, the stock was to be held as collateral security.    If nothing more had been said, probably the true construction would be that the making of the notes and the issuing of the stock were to be cotemporaneous acts; as it is difficult to see how the stock was to be received as collateral security before it was issued.    In fact, the circumstance that the stock was to be issued in his name and deposited by him as collateral security to his notes, shows that he was regarded as the owner; that the title to it had attached and vested in him, subject only to the conditions of the proposed bailment. The transaction was an hypothecation of the stock by one stockholder to secure his debt to his associate or to the corporation—it is immaterial which—and this supposes an original ownership in the stock by the pledgor.    If this share of the stock did not belong to

Chater *v.* San Francisco Sugar Refining Company.

Chater, to whom did it belong? Not to the corporation, nor to Bond and Gordon; for the agreement only gave them a lien on it, and this as the property of Chater, and to secure Chater's debts. But it is provided in a subsequent clause of the article that the stock of Chater was to be issued to him on the execution of the agreement afterwards entered into, by which Chater bound himself to manage the works. It seems that Bond was to pay $12,500 and Gordon a like sum; this was their contribution to the capital stock; Chater, we infer, was unable to pay in money; but to enable him to raise his proportion, he was to execute his notes to Bond and Gordon, and they guaranteed that they would raise it for him on his stock. The notes bore, or were to bear, interest. Chater did not at this time owe Bond and Gordon anything on this agreement; but this arrangement of the notes was a mere mode of enabling him to raise money which it was anticipated might be needed for the purpose, and as a part of the capital of this business; and they guaranteed, as said before, that on this security they would raise it for him; and the form the transaction took was designed for *their* security. If they loaned him the money on other security, or without any security, they could not complain because he had not gone through the particular, process which the agreement prescribed. They might waive this or any other term of the agreement designed for their benefit or protection. The agreement that the stock should be held, and that Chater should pay this sum, was the security to Gordon and Bond, which they could enforce if they advanced the money according to contract. There is no proof that they demanded the notes or issued the stock, or that the failure to give the notes operated in any way to their prejudice; and there is proof that long after the time when the notes, according to the pretension, were to be made and the stock issued, the business was continued and Chater recognized as interested in it. If Bond and Gordon had not paid *their* money for all this time, and Chater had made his notes in time, could it be pretended that payment by Gordon and Bond afterwards would not entitle *them* to *their* interest? Or if they had never paid, and the business was carried on on credit, or otherwise, until the profits paid the debts, could it be held that they had forfeited their stock? The truth is, we do not regard either.

the payment of the money or the giving the notes of Chater as conditions precedent to the rights of these parties as stockholders. These rights they had by the agreement and the act of incorporation; for if none had paid, to whom would belong the stock? There is no clause of forfeiture for nonpayment or nonperformance; as corporators, the whole business and the whole stock were theirs. But this clause as to Chater was for the security of the corporators *inter sese;* it qualified the title to stock as between the parties, which title the law gave by virtue of the relation of the stockholders to the corporation. But so long as Chater owed for the stock or capital, he could not have it issued to him; not because he did not originally own it, but because he had agreed that another disposition should be temporarily made of it; it was pledged, in other words, for the payment of his debt; and whenever the debt was discharged—it is not material in what way—it became released. If it was necessary to use the money represented by Chater's notes or debt, Bond and Gordon were to raise it; and whether they raised it on the notes, or stock and notes, or in any other way, is not material. In any event, by the agreement, they held the stock as security, and they bound themselves to raise the money for Chater; the failure to issue the *certificates* of stock was merely a failure to get the security in the form which might be more convenient to them if they had to borrow the money from third persons; and so of the failure to get the notes of Chater. But if no money was necessary, or if it could be conveniently raised otherwise, or advanced by Gordon and Bond, every object was answered that could be accomplished by the literal performance of this agreement. The whole case in this view of it may be thus summed up: Three men enter into an agreement to form a corporation for commercial purposes. By this agreement, and the corporate act, each corporator is entitled to an equal proportion of the stock; two contribute to the capital in money; the third has no money—he proposes and is allowed to give his note in lieu of money, pledging his stock as security; the other two agree that on this stock they will raise him the money. It is agreed that the stock due him shall be issued on a given event; the event happens. The note is not made nor the stock issued to him, but the company, controlled by the other two

corporators, goes on recognizing the third as a corporator; no demand is made for his note or the stock issued to him.   The corporation makes profit enough to pay the debts, and the share coming to the third partner pays his contribution.   No stock is issued to him, and he now claims it.   If the two who were to raise the amount to be contributed by the third, having by the agreement the right to demand his note and stock, do not demand them or issue the stock to him, and without *this form* of security, advance the money which was to be raised, they are to be considered as waiving this formal right, and are not at liberty to plead the want of a mere literal compliance as a forfeiture—for such it would be—of the interest of the third partner in the common enterprise.   In equity, the substance of the whole transaction is fulfilled; the object of the security answered; and the original right of the plaintiff here to his stock is not lost by a mere failure on his part to give a particular form of security, upon which those beneficially interested in demanding it did not insist.   What, in such a state of things, was not insisted upon was waived; and equity not regarding mere modes or forms, but looking at the very substance of the transaction, is satisfied when the substantial purpose is effected, though not effected in the precise way contemplated by the parties; and this is the more especially true, if this failure to follow the prescribed mode be owing to the laches, or be by the waiver or acquiescence of the party entitled in strict right to insist upon it.   The notes of Chater were merely to represent his debt, and the money to pay this debt Bond and Gordon were to raise on the security of his stock, they being interested in using it; and whether the stock was issued in the form of a certificate or not, it was bound by the agreement; and if they chose, they could as safely advance the money without the note, and the substance of the whole arrangement be attained.   It is not necessary for us, therefore, to consider the other points urged, to say the least, with plausibility in avoidance of the ground taken by the appellants to sustain the proposition just discussed.

This view distinguishes this case from mere executory agreements through a performance of the terms of which a party becomes entitled to property, of which class *Green* v. *Covillaud* (10 Cal.) and the other cases cited by appellants, are examples.   Here Chater

was entitled, as of original right, to his stock, and the conditions annexed to the issuance of the certificates to him, even if not waived, at most were mere qualifications in favor of his associates, of that right, and in the nature of security to them, the substance of which security they enjoyed, and a failure of the precise process prescribed, neither by the general principles of law applicable to such contracts, nor by the express terms of the agreement, worked a forfeiture of his interest in the stock, nor in the business of the corporation.

2. We think there is nothing in the point that the rendering of plaintiff's services for the five years was a condition precedent to the vesting of the plaintiff's title to the stock. Nothing in the agreement so declares. The provision for the employment of plaintiff as superintendent seems to be an independent term of the agreement. He was to get a salary of $3,000 per annum for his services as such, which does not seem to be entirely consistent with the idea that these services entered into and constituted a part of the general consideration of the agreement which was the basis of the association. It is very true that the reputed or supposed skill of the plaintiff in the proposed business may have been a motive for proposing to take or accept him as a partner in a new and hazardous enterprise of this sort; but this is a very different thing from making the rendition of his services an indispensable requisite to any claim to the profits or business, and his contracting that, despite of all accidents or casualties, he would render the services or lose his interest; or in other words, insure his life, mind and health for five years, or forfeit everything except the salary already earned. The more reasonable interpretation of the contract is, that the services, advice, etc., of such a man were of value to this company in this untried scheme, and that to carry it on they were as willing as himself to take the risk of natural or accidental causes which might disable him from prosecuting the business of superintendent, and that for his contribution to the capital of the company, his stock was considered as good security. This construction is strongly fortified by the provision that if the company became dissatisfied with his management they might discharge him, thereby stopping his pay as superintendent; but it was stipulated in this connection that

this discharge was not to affect the agreement otherwise. This itself is strongly persuasive, if not conclusive, of the inference that his death or sickness was not to affect it; for it is incredible that if he became wholly unfit for the business, or acted so fraudulently and culpably as to require the company, for their safety and protection, to discharge him, this was to be insufficient to deprive him of his rights, under the contract, to his share in the business, and yet that a mere misfortune or visitation of Providence, for which no blame rested on him, was to have this effect; and this, even though the casualty happened in the last year of his service. Nor is it at all probable, if this had been the understanding, that the agreement would have provided for the issuance of the stock to him so long in advance of the time, and the events when or upon which he would be entitled to it.

Moreover, if the rendition of these services was a consideration of the vital importance to the contract now pretended, it is not apparent why, in case of his misconduct or mismanagement, the consequence should be confined to the mere loss of the place and the wages, with an express reservation in favor of the interest he held under the other parts of the agreement.

Such an agreement as that supposed would be very unequal, if we suppose that Chater had the qualifications evidently attributed to him at the time of the forming of the agreement. It could scarcely be supposed he would be willing to leave New York— where he was residing—to come to San Francisco to be discharged at any time, thus losing his wages as superintendent, and then without wages to wait for five years before he could get anything on the contract; or in case of sickness or death, after inaugurating the business and giving his assistance in getting it under way, should lose, for himself or family, everything for which he had made sacrifices in migrating to this State.

It is much more reasonable to suppose, as well from the nature of the case and surrounding circumstances as from the language of the contract, that the services of Chater were considered equal to the money, or money and credit of Bond and Gordon, in starting a new enterprise of this sort, especially when he was to draw no profits and be entitled to no interest in the business until after he

had paid his proportion—the stock itself being the security for such payment. Other portions of the agreement—such, for example, as the obligation of Chater, if discharged, not to engage in California in the business of sugar refining, add weight to the construction we give to the agreement. We do not consider it necessary to give further elaboration of these views.

3. We think that this agreement, made by these stockholders, Bond and Gordon, who really represented the interests and persons afterwards incorporated, and whose agreement was only in anticipation of the formation of the corporation, and for its benefit, and was carried out by it, and recognized by it, bound the defendants.

4. Other points need not be noticed; for the provision for the salary of Chater as superintendent, being independent of his interest as stockholder, it is not necessary to go into any inquiry in this place of the failure, or of the consequences of a failure on his part to fulfill his obligations as such.

A speedy remedy, however, was left by the contract to the corporation for any failure, for any cause, to discharge his duties, by his dismissal.

Decree affirmed.

*Hepburn & Dwinelle*, on petition for rehearing.

I.   The Court takes no notice of the objection that the decree of the Court below gives three hundred and thirty-three and one-third shares of the stock to Chater, when, by the agreement, he was only entitled to two hundred and fifty shares.

The agreement provides that if any of these shares belonging to the common stock of the company shall remain unsold, and "if it shall not be found necessary to sell them," such remaining shares shall then be equally divided among the three parties to the contract.

The contingent interest of Chater in this unsold portion of this common stock, together with the two hundred and fifty shares apportioned to him, were to be held to guarantee the performance of his contract.

Nevertheless, the decree compels the company to issue to Chater the eighty-three and one-third shares, which he, in common with Bond and Gordon, was not to be entitled to, except in a remote con-

tingency, without his paying anything for them ; and more particularly it discharges them from the lien which he agreed to give the company upon his stock to secure the performance of his contract. The Court below, without evidence, decides : 1st, that the shares of common stock have not been sold ; 2d, that it is not necessary to sell them ; 3d, that Chater has a higher, better and different right to these than to the two hundred and fifty shares, because they are to be given to him without any lien on them, to secure either his original subscription or his performance of contract.

The company have either sold these shares, or they have not. If they have sold them, then the contingency on which Chater was to be entitled to them never happened ; and if they have not sold them, they should not have been assigned to Chater, but held subject to a final account, so as to ascertain whether or not it would be "necessary to sell them." In either case the decree is erroneous.

II.   The Court, it is respectfully submitted, have not given due consideration to the vital question, that the *corporation* was not bound.

The whole reasoning of the opinion is founded on the assumption that the agreement and the corporate act give Chater a right to one-third of the stock as against the corporation.   We take ground against this position, and propose to show : 1st, that neither the agreement nor the act of incorporation gave Chater any rights whatever against the corporation ; 2d, that the corporation could be bound, only by adopting or becoming a party to the agreement, and that the evidence shows it never did adopt or become a party to the agreement.

1. As to the agreement and the act of incorporation.

The corporation was organized and took effect under the Act of April 14th, 1853, and we contend that Chater got no rights against the corporation in virtue either of the act of incorporation or the agreements.

By the Act of April 14th, 1853, a corporation is born on the filing of a " certificate of incorporation," which also creates shares of capital stock by simply declaring their number and amount. These remain until by-laws are formed which direct the mode and condition of their transfer.   They do not vest in a private person

except by some act of the corporation done according to law, which is called "issuing." Until this act takes place, shares of stock remain in the corporate estate, to be transferred to any subscriber who, contracting with the corporation, takes them for a consideration (which then becomes the property of the company in the place of the shares) who thereupon, and not before, becomes a stockholder. Some precise action defined in the by-laws is imperative, otherwise the corporation is not divested and the stockholders invested. The idea is, that no shares of stock in an incorporated company can vest in any private person, unless they are issued by the corporation according to law, and properly recorded in the company's records. No agreement which may have been made by the corporators before incorporation, as to dividing stock, makes them stockholders, or vests in them any right to stock. No man can become a stockholder, unless he obtains an issue of stock from the corporation according to its by-laws.

By the agreement, Chater, Gordon and Bond, so far from making themselves partners with each other in a manufacturing enterprise, were simply contracting with each other to get somebody else, an entirely distinct individual, to carry on the business. They, Bond, Chater and Gordon, were not to refine sugar, but another person— a body corporate yet to be born according to California law—was to do it, and the thing they were agreeing to do was to give birth to this individual, and give him capital to work with.

They might or might not be members of this body corporate; for the issue of stock in it, which was to give membership, was to be made to " them or their assigns upon either they or their assigns paying " certain amounts of money to the corporation—*upon* here meaning after, or upon condition.

The certificate of incorporation was taken out on the twenty-fourth of July, 1856, in San Francisco. It was done by Chater, Gordon and C. W. Bond. At the time, James B. Bond was in New York, where he has been ever since, and where he is still; and he has never owned one share in the stock of this company. The act of incorporation was made by others than the parties to the New York agreements; that the company was a stranger to the agreements when they were made, and the act of incorporation in nowise changed its position or affected its liability.

III.   The company never adopted, or made itself a party to these agreements.

The first agreement says :  " The stock of N. Chater to be issued to him on the execution of an agreement to manage the works, a memorandum of which is made simultaneous with this."

There is no direct proof that the corporation ever adopted the New York agreements, nor is there any act or acts of the company which show an adoption or ratification.

As Chater, under the agreements, was entitled to his stock on the execution of his notes and the execution of the contract for personal service, the fact that he neither executed the notes, nor the contract, nor got the stock, shows that there must have been some reason for it ; either that he backed out, or that the company refused to come in.

But it may be said, he was an organizing trustee.   So was C. W. Bond, but neither he nor Chater were stockholders, and the law did not require them to be.   The act of signing and filing a certificate of incorporation vests no stock, nor any right thereto, in the organizing trustees.   The trustees for the first three months are only organizing machines necessary to form a company by which shares of stock may be created and issued.

But it may further be said that he was employed by the company at the works.   The proof is distinct that this was as foreman and not as chief, and that Gordon was chief.   The Court itself has said that " the provision for the salary of Chater as superintendent is independent of his interest as stockholder."   With equal reason may it not be said that the payment of his salary as foreman " is independent of his interest as stockholder."

To be told of the agreement between Gordon, Bond and Chater, is to be told of a transaction between Gordon, Bond and Chater, and them only.   New stockholders could not imagine that the corporation, which never contracted with Chater, would be sued for one-third of its property, on an agreement made before its existence with one, and only one, of its stockholders ; and that judgment would go against it without evidence as to whether Gordon, Bond or the corporation had any stock to issue, or whether assignees or new corporators owned it all, or what additional capital had been created, and what additional stock had been sold.

Chater *v.* San Francisco Sugar Refining Company.

There is but one way in which stock in a corporation can vest, and that is the way pointed out and prescribed by the statute. (*Wallingford Manufacturing Co.* v. *Fox,* 12 Vt. 304 ; 15 Id. 519 ; 35 Eng. C. L. 96 ; 35 Eng. L. & E. 23 ; 30 Law Times, 84.)

*Heydenfeldt, Contra.*

Each of the three parties forming the corporation was entitled to an equal one-third of the stock, three hundred and thirty-three and one-third shares ; but eighty-three and one-third shares of the shares of each were to be reserved and not issued, to be used by the corporation if a contingency should arise—that is, should be sold—but if not sold, these to be equally divided between the three not sooner than twelve months after the works have been in operation.

The answers do not pretend that it was ever necessary to sell this reserved stock, or that it ever was sold, so that Chater's claim remains undiminished to the entire one-third of the stock. If it should turn out in taking the account which has been ordered, that any of this reserved stock was necessarily sold, if it is not too late, the Chancellor below might, upon the report coming in, make the allowance, but there is absolutely nothing in relation to that matter which this Court can act upon.

BALDWIN, J. delivered the opinion of the Court upon the petition for rehearing—FIELD, C. J. and COPE, J. concurring.

We propose to notice only two points made by the appellants on their petition for rehearing. The first is that as to the alleged error in the decree below, that Chater was entitled to three hundred and thirty-three and a third shares of the stock, when by the agreement he was only, at most, entitled to two hundred and fifty shares. As to the eighty-three and a third shares, a part of the common stock of two hundred and fifty shares, it was provided that, after being issued to the respective holders, (one-third to each) they were to be given back to the company, and sold only by a majority vote of the company, and that the shares not sold, belonging to the common stock of the company, shall, if it be not found necessary to sell them, be divided equally among the three parties, but not until the

company's works have been in operation for at least twelve months. We see no evidence that these eighty-three and one-third shares of Chater were ever so sold, or that there was any necessity to sell them. Indeed, they were never issued to him at all. Originally he had a right to them; but after getting the certificates he was to return them to the company—the company to hold them, and in the given event, use them to pay its debts. The decree only affirms the title of Chater to them. If on a settlement of the account it be found that Chater owed on account of his stock, or the corporation owed money for which the stock should have been sold, possibly the stock, which was designed to be a security for the debts, would be in equity charged, and ordered to be so applied. That matter does not arise now on the pleadings or proofs, and we leave it open for settlement upon the final hearing, and the decree may be so reformed, if it be deemed necessary, as to reserve the question, unaffected by the decree, for disposition when all the facts can be presented.

2. It is next insisted that we erred in holding that this agreement bound the corporation. That point was barely suggested on the oral argument, and in the learned and able briefs of the counsel. No great stress seemed to be laid on it. We gave it no very elaborate consideration, for we really supposed—erroneously, perhaps—that the counsel placed but little reliance upon it. The argument now on this point is very full and very ingenious, but as applied to the facts of this record is not sound.

Every opinion, as Chief Justice Marshall well observes, must be considered with reference to the particular facts upon which it is made; for it is impossible so to use language as that general expressions apply in every instance with the same meaning to every condition of facts. We asserted no such doctrine as that, by force of a secret agreement between the original corporators in a commercial corporation, whether made before or after the Act of Incorporation, the stock issued by the corporation to innocent parties without notice of the agreement could be charged or affected by it. There was no case before us for the application of such a principle. But the right to incorporate for such a purpose as that here is a statutory right, which is free to everybody. The rights in the

corporation can be adjusted by contract, and the terms fixed by contract. The corporation is little more, under our laws, than a joint stock company under the English laws; indeed, in its true nature more nearly resembling a limited partnership under special articles than a corporation at common law. This corporation was organized under an agreement, which was in itself legal and binding. The original corporators were really the men (except one—if indeed, he were not the assignee of one) who made the agreement, and were bound to execute it. They had the power to execute it; for they had on the organization the power, subject to restrictions which we do not apply here, to control their own business in their own way. A man may as well make an agreement with another for certain stock in a corporation to be organized hereafter, as an agreement for stock in a presently existing corporation. If A, B and C agree to form a corporation for a railroad with a capital of so much, to be represented by so many shares of stock, why may not they contract that each is to have so many shares on such and such terms? What rule of law forbids? Is there anything immoral in the contract, or opposed to public policy? Cannot a man as well *subscribe* one time as another for stock, if all interested consent? Indeed, as under this particular agreement they organized, *so far as the then members are concerned,* the agreement becomes as effectual as if a part of the corporate act. As there is in this respect no restriction upon the terms on which they associate or do business, or to the time of making them, why not find those terms in an antecedent agreement as well as a present adoption, if the preceding agreement is connected by clear proof with the act of incorporation and its affairs? Suppose A, B and C agree to form a corporation for running stages, and put in, each, $10,000, but there are to be no certificates of stock issued and no debts incurred. This agreement precedes, of course, the incorporation; and suppose the money is paid before the corporate act is consummated. The corporation is formed and proceeds to do business. Will it be contended that these men are not entitled to their respective shares of the profits, etc., from the mere fact that all this occurred before the technical, ideal thing—the corporation—was called into existence? The truth is, the corporation, under our system, following such an

agreement, would be the mere agency of the associates created for the sake of convenience in carrying out the agreement, *as between those who made the bargain*—the different characters or forms in which or by which the bargain was made, and the order in which the several parts of it were executed, making no substantial difference in the obligation.  But if it did, and this ideal thing, the corporation, be something essentially distinct and exclusive, making the men inside of it and controlling it wholly different from the same men just before they went into it ; yet these shares are interests and property *in esse* or *posse*.  This interest, or those shares, entitle the holder to certain privileges of value, and may entitle him to profits.  Whether, therefore, the corporation is bound of itself, and as a separate entity, to recognize a right in a claimant to this interest, a private person holding these shares or interests would be bound to such claimant for them.  But apart from all this, when the corporation became such, it organized with Chater, Bond and Gordon as trustees, and these were really the sole corporators also ; and they organized with full knowledge of this agreement, which not only contemplated the formation of the company or corporation, but prescribed the terms and rights of the members in the corporation and corporate business.  Chater was not only superintendent under this agreement, but trustee too ; and the corporate business was commenced and for a long time prosecuted with reference to this agreement, which recited these terms and affirmed these rights.  If anything could be, this was an adoption by the corporation of these terms.  It is not necessary to inquire whether an innocent purchaser of the stock, buying subsequently without notice, would be affected by any such acts—for no such question is before us now.  If the corporation be bound by this agreement, and the Court, proceeding to enforce it by ordering the issuance of stock, should affect injuriously any innocent holder of stock, it will be time enough to consider his rights, legal or equitable, when the facts and proper parties are before the Court.

If on taking the account, it should appear that Chater is not entitled to anything, but that the corporation is so indebted as to make it inequitable for him to receive his shares, the Court below,

on the final hearing, can make the proper decree, unaffected by anything in the decree under review.

With these modifications, the decree is affirmed and the cause remanded.